**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**SHERIE A. GILES and LEWIS P. GILES,**

                                        **Plaintiffs,**

          **vs.**                                              **6:09-cv-293**
                                                               **(MAD/ATB)**

**AT&T, INC., UNITED HEALTHCARE**
**INSURANCE COMPANY, and AT&T, INC.**
**MEDICAL PLAN,**

                                        **Defendants.**
_____

**APPEARANCES:**                                  **OF COUNSEL:**

**MURPHY, BURNS, BARBER & MURPHY, LLP**      **PETER G. BARBER, ESQ.**
226 Great Oaks Boulevard
Albany, New York 12203
Attorneys for Plaintiffs

**RIVKIN RADLER LLP**                              **PETER P. MCNAMARA, ESQ.**
926 RexCorp Plaza                                  **NORMAN L. TOLLE, ESQ.**
Uniondale, New York 11556-0926
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On March 10, 2009, Plaintiffs brought this action pursuant to the Employee Retirement

Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), for, among other things,

reimbursement of medical expenses under an employee benefits plan relating to intravenous

("IV") antibiotic therapy used to treat Lyme disease. *See* Dkt. No. 1. On January 26, 2010,

Magistrate Judge Baxter granted Plaintiffs' unopposed motion to amend the complaint. *See* Dkt.

No. 22.

Currently before the Court are the parties' cross-motions for summary judgment and Defendants' cross-motion to strike the affidavits of Sherie A. Giles, Lewis P. Giles, Kenneth Liegner, M.D., and Peter G. Barber (the "Affidavits") submitted in support of Plaintiffs' motion for summary judgment, to the extent that the affidavits contain information that is not contained in the Administrative Record.

## II. BACKGROUND

Plaintiffs are married and reside in Northhampton, New York. *See* Dkt. No. 40-1 at ¶ 2. Plaintiff Sherie Giles is a former management employee with Defendant AT&T. *See id.* at ¶ 3.

Defendant AT&T maintained Defendant AT&T Umbrella Benefit Plan No. 1–AT&T Medical Plan (the "Plan") – an employee benefit plan subject to ERISA. *See id.* at ¶ 4. The Plan identifies Defendant AT&T as the "Plan Sponsor" and "Plan Administrator," however, Defendant United Healthcare Insurance Company ("UHIC") has been delegated discretionary authority by Defendant AT&T to make benefits determinations under the Plan. *See id.* at ¶ 5; Dkt. No. 46 at ¶ 5. The Plan provides for the filing of claims for covered health services with the Claim Administrator. Within thirty days of receipt of the claim, the Claims Administrator provides the claimant with a benefit determination for each claim submitted. Pursuant to the terms of the Plan, a denial notice must explain the reason for the denial, refer to the part of the Plan on which the denial is based, and provide the claimant with the claim appeal procedures necessary to challenge the determination. *See* Dkt. No. 40-1 at ¶ 6.

Plaintiff Sherie Giles is an eligible retiree of Defendant AT&T and is a qualified participant in the Plan. *See id.* at ¶ 7. As her husband, Plaintiff Lewis Giles is also a qualified participant in the Plan. *See id.*

2

Beginning in 1987, Plaintiff Sherie Giles began experiencing symptoms of illness, which were later attributed to one or more tick-borne infections, including Lyme disease.  *See* Dkt. No. 40-1 at ¶ 9; Dkt. No. 46 at ¶ 9.  Plaintiff retired from Defendant AT&T's employ in 1996 because her illness made it so that she could no longer discharge her responsibilities.  *See* Dkt. No. 40-1 at ¶ 10; Dkt. No. 46 at ¶ 10.

After a prolonged period of unsuccessful treatment, Plaintiff Sherie Giles began treatment with Dr. Kenneth P. Liegner.  *See* Dkt. No. 40-1 at ¶¶ 11-12; Dkt. No. 46 at ¶¶ 11-12.  In a Consultation Record dated October 31, 1997, Dr. Liegner recorded Plaintiff Sherie Giles' chief complaints, including fatigue, headache, joint and muscle pain and achiness, depression, sleep disturbance, ringing in the ears, and abdominal bloating.  *See* Dkt. No.40-1 at ¶ 14; Dkt. No. 46 at ¶ 14.  Following subsequent laboratory tests and clinical evaluation, Dr. Liegner diagnosed Plaintiff Sherie Giles with Lyme disease.  *See* Dkt. No. 40-1 at ¶ 16; Dkt. No. 46 at ¶ 16.

Thereafter, in July of 2006, Plaintiff Sherie Giles consulted with Dr. Arniram Katz.  *See* Dkt. No. 40-1 at ¶ 17; Dkt. No. 46 at ¶ 17.  In a Consultation Record dated July 24, 2006, Dr. Katz recorded Plaintiff Sherie Giles' chief complaints, history, and examinations.  Given the evidence of Lyme disease, Dr. Katz recommended IV antibiotic Rocephin[1] treatment for a minimum of ninety days and then to evaluate whether the symptoms improved.  *See* Dkt. No. 40-1 at ¶ 18; Dkt. No. 46 at ¶ 18.  In an Addendum dated November 4, 2006, Dr. Katz noted that, in a follow-up visit, he reviewed the results of diagnostic brain scans, *i.e.*, PET, SPECT and MRI, at Yale New Haven Hospital.  *See* Dkt. No. 40-1 at ¶ 19; Dkt. No. 46 at ¶ 19.  Dr. Katz stated that these images provided further support for the need for treatment with IV antibiotics for Lyme disease.  *See id.*

---

[1] Rocephin is a brand name for the antibiotic ceftriaxone.

In a Private Contract for Medical Services dated January 1, 2007, Dr. Liegner informed Plaintiff Sherie Giles that he had opted out of the Medicare program and they agreed that charges for his services were Plaintiffs' responsibility.  *See* Dkt. No. 40-1 at ¶ 21; Dkt. No. 46 at ¶ 21.  In March of 2007, because of complications, Plaintiff Sherie Giles stopped taking her oral antimicrobial therapy.  *See* Dkt. No. 40-1 at ¶ 22; *but see* Dkt. No. 46 at ¶ 22.  Considering her deteriorating health, Dr. Liegner decided to start Plaintiff Sherie Giles on the recommended course of IV antibiotic therapy.  *See* Dkt. No. 40-1 at ¶ 23; *but see* Dkt. No. 46 at ¶ 23.

In a letter dated March 23, 2007, Dr. Liegner requested a pre-service authorization from Defendant UHIC for the medical necessity of IV antibiotic treatment for Lyme disease with central nervous system indications.  *See* Dkt. No. 40-1 at ¶ 24 (citing AR 2148); Dkt. No. 46 at ¶ 24.  Dr. Liegner supported this request with copies of laboratory tests indicative of Lyme disease, and Dr. Katz's consultation record which recommended IV antibiotic therapy.  *See id.*  In a response dated April 11, 2007, Defendant UHIC stated that "BENEFITS WILL BE ALLOWED FOR THE PROPOSED CODE J0696,"[2] but qualified its approval as follows:

> PAYMENT OF CHARGES WILL BE SUBJECT TO PATIENT ELIGIBILITY AT THE TIME SERVICES ARE PROVIDED.
>
> THE PATIENT WILL ALSO BE RESPONSIBLE FOR ANY:
> – COPAYMENT
> – PLAN DEDUCTIBLE
> – COINSURANCE AMOUNT, AND
> – NON-COVERED ITEMS.

*See* Dkt. No. 46 at ¶ 25; *see also* Administrative Record ("AR") at 2194.

On March 27, 2007, Dr. Liegner started Plaintiff Sherie Giles on a course of treatment of Rocephin (Ceftriaxone) by means of an IV infusion through a surgically implanted port.  She

---

[2] Code J0696 is for the administration of IV antibiotic Rocephin.  *See* Liegner Aff. at ¶ 13.

would generally visit Dr. Liegner's office weekly for dressing changes and huber needle and infusion tubing.  Dr. Liegner would generally examine and evaluate Plaintiff Sherie Giles every two weeks.  *See* Dkt. No. 40-1 at ¶ 26 (citing AR 774-75).

With the initiation of the IV antibiotic therapy, Dr. Liegner submitted claims on Plaintiff Sherie Giles' behalf to Defendant UHIC for services rendered.  *See id.* at ¶ 28 (citing AR 757-1191).  In support of the claims, Dr. Liegner subsequently submitted documentation supporting the need for treatment, including the Treatment Guidelines of the International Lyme and Associated Diseases Society ("ILADS"),[3] and studies of the effects of long-term IV antibiotic treatment for Lyme disease.  *See id.*[4]  In a letter dated February 20, 2008, Defendant UHIC notified Plaintiffs that it was denying Plaintiff Sherie Giles' claims for services that were obtained subsequent to November 8, 2007.

In a letter dated August 18, 2009, Dr. Liegner summarized his treatment of Plaintiff Sherie Giles and the progress she made while under his care.  *See* AR at 3185-86.  Specifically, Dr. Liegner summarized Plaintiff Sherie Giles' treatment, condition, and progress as follows:

> Prior to March of 2007, Sherie Giles had been treated with
> oral and intramuscular antibiotics which had been only partially

---

[3] ILADS is an interdisciplinary organization established to analyze the medical literature and published position statements and practice parameters related to Lyme and associated diseases.  *See* Dkt. No. 40-1 at ¶ 29 (citing AR 512).  The ILADS has offered the opinion that the guidelines of the Infectious Disease Society of America ("IDSA") fell short with regard to the diagnosis and treatment of patients with chronic and neurologic Lyme disease.  *See id.* (citing AR 512).  Although the ILADS has no authority over the IDSA, the ILADS specifically determined that the IDSA Guidelines failed to consider peer-reviewed and published evidence confirming the existence of persistent, recurrent and refractory Lyme disease.  *See id.* at ¶ 30; Dkt. No. 46 at ¶ 30.  As determined by the ILADS, the IDSA Guidelines failed to address the treatment necessary for chronic Lyme disease.  *See id.* (citing AR 512); Dkt. No. 46 at ¶ 30.

[4] The Court notes that Defendants deny this statement "to the extent that it implies that such documentation establishes her entitlement to additional benefits under the Plan."  *See* Dkt. No. 46 at ¶ 28.

effective in arresting the progression of her chronic neurologic Lyme infection.  In May 2006, her neurologist had recommended initiating a course of IV Rocephin.  Throughout the succeeding nine months, she attempted to arrange for a local physician to administer this IV treatment.  However, she found that she was unable to obtain this treatment from physicians in her health plan network. By March 2007, after the onset of severe tinnitis, she stopped taking her oral anti-microbial therapy.  Her overall functioning thereafter rapidly declined and she began to exhibit a wide variety of new psychiatric and sensory problems.  Hyperacusis and other forms of sensory overload became debilitating.  She seemed to have lost or severely distorted her perception of time.  She could not listen to music or watch TV due to not following time sequences.  Language function was also quite bizarre, at times, often degenerating to gibberish.  Her attention span was often barely over a second, but at other times was almost normal.  With all of these changes, she also had much panic.  Only with the full time and frankly heroic efforts of her husband, a psychologist, was she able to avoid hospitalization or a nursing home, obtain the surgical implantation of an IV port, and initiate the treatment.

After two months of the IV antibiotic therapy, her language generally normalized, and the severe Lyme induced organic brain syndrome began to relent.  Thereafter, progress was slow but steady so long as the treatment continued.  In July of 2008, Sherie Giles' liver enzymes became sufficiently elevated to warrant suspending the therapy for a period of two weeks.  It thereafter became evident that the culprit causing the liver enzyme elevation was Nexium prescribed by her gastrointerologist for a peptic ulcer rather than the antibiotic.  But it was noteworthy that during the period off antibiotic therapy, she experienced a significant decline in cognitive functioning.  Upon resumption of treatment, the decline was reversed and cognitive improvement, albeit again slow, continued at a gradual but steady pace.

In April of 2009, with an apparent leveling off of her progress, treatment was suspended to see if gains would hold. Cognitive and emotional functioning has held steady.  Significant fatigue and frequent muscle soreness, however, persist.  Sherie Giles is now being continued on oral and intra-muscular antibiotic therapies along with anti-babesia therapy and other supportive therapies to address the current persistent symptoms.

6

*See* AR at 3185-86; *see also* AR at 3187 (providing letter of Dr. Mittelman dated August 20, 2009, also concluding the necessity of IV antibiotic treatment and the benefits that it has served).[5]

Upon receiving notice that Plaintiff Sherie Giles' claims for IV antibiotic treatments, which were obtained subsequent to November 8, 2007, were denied, Plaintiffs appealed. Plaintiffs submitted two levels of appeal for services that Plaintiff Sherie Giles received for the following time periods: (1) January 1, 2008 through November 12, 2008, and (2) November 13, 2008 through April 16, 2009.

**A.      The Plan's provisions**

Defendant UHIC is the claims administrator under the Plan.  According to the Plan, Defendant AT&T has delegated to Defendant UHIC, as its claims administrator, "the exclusive right to interpret and administer the provisions of the Plan."  *See* AR at 274.

The Plan also states that "[c]ertain medical services are not covered by [the Plan]."  *See id.* at 251.  For example, the Plan provides that "Experimental or Investigational Services or Unproven Services are excluded.  The fact that an Experimental or Investigational Service or an Unproven Service, treatment, device or pharmacological regimen is the only available treatment for a particular condition will not result in Benefits if the procedure is considered Experimental or Investigational or Unproven in the treatment of that particular condition."  *See id.* at 251.  The Plan defines "Unproven Services" as follows:

> Unproven Services are services that are not consistent with
> conclusions of prevailing medical research which demonstrate that
> the health service has a beneficial effect on health outcomes and
> that are not based on trials that meet either of the following designs:

---

[5] The Court notes that these letters were drafted as part of Plaintiffs' appeals.

-Well-conducted randomized controlled trials.  (Two or
more treatments are compared to each other, and the patient
is not allowed to choose which treatment is received.)

-Well-conducted cohort studies.  (Patients who receive study
treatment are compared to a group of patients who receive
standard therapy.  The comparison group must be nearly
identical to the study treatment group.)

*See id.* at 321.  Moreover, the Plan provides that "[d]ecisions about whether to cover new

technologies, procedures and treatments will be consistent with conclusions of prevailing medical

research, based on well-conducted randomized trials or cohort studies, as described."  *See id.*

Since at least 2001, Defendant UHIC has had a written medical policy regarding the

treatment of recurrent or chronic Lyme disease, which is periodically updated.  The policy in

effect from November 15, 2007 through November 16, 2008, states that "[c]linical evidence

supports the use of intravenous antibiotics such as ceftriaxone, cefotaxime, or penicillin G for up

to 4 weeks duration for the treatment of chronic or recurrent Lyme disease."  *See* AR at 488.

Moreover, citing to guidelines published by the IDSA, the Lyme disease policy states that,

[i]n the early and late disseminated stages of Lyme disease when
acute neurological diseases, such as meningitis or radiculopathy are
present, intravenous ceftriaxone or penicillin for up to 4 weeks
duration is recommended.  In cases of late neuroborreliosis affecting
the central or peripheral nervous system, treatment with intravenous
ceftriaxone, cefotaxime, or penicillin G for 2 to 4 weeks is
recommended.  Response in late stage is generally slow and may be
incomplete.  Repeat treatment may be indicated if relapse is
confirmed by reliable, objective measures.  In these cases,
appropriate antibiotics are ceftriaxone, cefotaxime, or penicillin G.

*See id.* at 490.  The Lyme disease policy also referenced another controlled study which treated

patients with chronic Lyme disease with intravenous ceftriaxone for thirty days, followed by oral

doxycycline daily for sixty days or matching intravenous and oral placebos.  *See id.*  The study

found that, "[a]fter completion of treatment with antibiotics, 37 percent of the seropositive group

showed improvement in the physical - and mental - component summary scales of the Short-Form
General Health Survey, 29 percent had no change, and 34 percent had a worsening of symptoms.
In the seropositive patients who received placebo, 40 percent improved, 26 percent had no change,
and 34 percent worsened.  The results were similar for the seronegative patients in both groups."
*See id.*

      In addition to the studies and other reports discussed in the previous policy, the updated
Lyme disease policy in effect from November 17, 2008 through May 14, 2009, cited to a study
published in 2008 which treated patients with IV ceftriaxone for ten weeks, which generally found
that the patients' mental and physical conditions moderately improved, but that "relapse in
cognition occurs after the antibiotic is discontinued[,]" and that "[t]reatment strategies that result
in sustained cognitive improvement are needed."  *See id.* at 502.  The updated Lyme disease
policy discussed guidelines developed by the American Academy of Neurology.  *See id.* at 503.
These guidelines "discourages the prolonged use of antibiotics to treat nervous system Lyme
disease, contending there is no compelling evidence that such treatment has any beneficial effect
in treating symptoms that persist following standard therapy."  *See id.*

      Finally, the updated Lyme disease policy discussed the ILADS Guidelines.  *See id.* at 505.
According to the Lyme disease policy, the ILADS Guidelines found that, "[b]ecause of the
disappointing long-term outcome with shorter courses of antibiotics, the practice of stopping
antibiotics to allow for a delayed recovery is no longer recommended for patients with persistent,
recurrent and refractory Lyme disease."  *See id.*  The ILADS Guidelines also provide that "[t]he
management of chronic Lyme disease must be individualized, since patients will vary according to
the severity of presentation and response to previous treatment."  *See id.*  As such, it recommends

that "[p]hysicians should always assess the patient's response to treatment before deciding on appropriate duration of therapy (i.e., weeks versus months)." *See id.*

**B.     Plaintiff Sherie Giles appeals of denial for services provided from January 1, 2008 through November 12, 2008**

On December 22, 2008, Plaintiffs appealed Defendant UHIC's denial of benefits for the treatments Plaintiff Sherie Giles obtained between January 1, 2008 and November 12, 2008. *See* AR at 2703-2767.  Plaintiffs argued, among other things, that Defendant UHIC's denial of benefits for those services was arbitrary because of the purported invalidity of the IDSA Guidelines, on which Defendant UHIC relied in making its decision. *See id.*

By letter dated January 10, 2009, Defendant UHIC informed Plaintiff that it was upholding its denial of benefits because those services were unproven, and because the "preponderance of the clinical evidence in the prevailing peer-reviewed medical literature was insufficient and inadequate to conclude that prolonged and repeated therapy with IV antibiotics is an effective treatment for recurrent or chronic Lyme's disease that has a beneficial effect on health outcomes." *See id.* at 2769-71.  Defendant UHIC's letter also informed Plaintiffs that, if they decide to appeal the decision, "it is recommended that you submit for consideration scientific evidence from well-conducted, randomized controlled trials or cohort studies demonstrating that prolonged and repeated therapy with IV antibiotics is an effective treatment for recurrent or chronic Lyme's disease that has a beneficial effect on health outcomes." *See id.* at 2770.

By letter dated March 10, 2009, Plaintiffs submitted a second-level appeal from Defendant UHIC's January 10, 2009 denial. *See id.* at 2799-2914.  A medical director for Defendant UHIC, Dr. H. Tehrani, reviewed this appeal and the medical literature that Plaintiffs submitted in support of their position.  Dr. Tehrani concluded that the evidence Plaintiffs submitted was insufficient to

establish that the additional IV antibiotic treatments from January 1, 2008 through November 12, 2008 constituted an effective treatment. *See id.* at 2918-20.  Dr. Tehrani further concluded that these treatments are considered an unproven service and that Plaintiff Sherie Giles was not entitled to any benefits for those services because "Experimental or Investigation Services or Unproven Services are excluded" under the terms of the Plan. *See id.*

**C.**   **Plaintiff Sherie Giles appeals of denial of services provided for November 13, 2008 through April 16, 2009**

By letter dated June 13, 2009, Plaintiffs appealed Defendant UHIC's denial of benefits for the IV antibiotic treatments Plaintiff Sherie Giles obtained between November 13, 2008 and April 16, 2009. *See id.* at 2937-72.  Plaintiffs' appeal was reviewed by Dr. Philip Robzyk.  By letter dated July 15, 2009, Defendant UHIC informed Plaintiffs that, based on Dr. Robzyk's review, it was upholding its decision to deny benefits. *See id.* at 2986-88.  Defendant UHIC again discussed the unproven nature of the treatments and the fact that the Plan does not provide benefits for experimental, investigational or unproven services. *See id.*

By letter dated September 5, 2009, Plaintiffs submitted a second-level appeal. *See id.* at 2994-3593.  Plaintiffs asserted that by basing his decision on the Lyme Disease Policy, Dr. Robzyk "clearly performed a bad faith review" because their first-level appeal challenged the scientific validity of that policy. *See id.* at 2955.  Plaintiffs again disputed the validity of the IDSA guidelines and also asserted that the treatment summaries provided by Dr. Liegner, and a concurring summary that they submitted from another physician, established that the IV antibiotic treatment Plaintiff Sherie Giles had received was "medically necessary and medically indicated." *See id.* at 2996.

By letter dated October 13, 2009, Defendant UHIC responded to a complaint letter Plaintiffs had sent to it.  *See id.* at 3603.  Defendant UHIC informed Plaintiffs that "all of the information [they] submitted with each request including the scientific literature, was reviewed both at the time that information was submitted to [UHIC]," and that "[i]n total, six different physicians, including two external infectious disease specialists reviewed the information submitted."  *See id.*

Defendant UHIC further informed Plaintiffs that "all six reviewers found that the preponderance of such literature on the subject does not support more than four weeks of IV antibiotic therapy for any form of Lyme disease," and that the conclusion of the reviewers "is also supported by our medical policy on the Treatment of Chronic and Recurrent Lyme Disease."  *See id.*  Moreover, Defendant UHIC informed Plaintiffs that "[t]he literature you submitted was not given much weight because it is not information from well-conducted randomized controlled trials or well-conducted cohort studies."  *See id.*  On this basis, Defendant UHIC informed Plaintiff that it "properly denied benefits for those treatments because the requested use of more than four weeks of IV antibiotics for treatment of Lyme disease was and remains unproven in the preponderance of the scientific literature."  *See id.*

Thereafter, by letter dated October 16, 2009, Defendant UHIC formally responded to Plaintiffs' September 5, 2009 second-level appeal.  Defendant UHIC informed Plaintiffs that, based upon a review of the documents that Plaintiffs submitted in support of their appeal, Dr. R. Guy Shrake determined that Defendant UHIC's denial of benefits should be upheld.  *See id.* at 3604-07.  This letter again set forth the terms of the Plan upon which Defendant UHIC was relying.  *See id.*

## III. DISCUSSION

**A.     Defendants' motion for summary judgment as to Plaintiff Sherie Giles' claims**

### *1. Summary judgment standard*

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

### 2. Standards of review applicable to ERISA actions

When considering an ERISA claim alleging improper denial of benefits, the Court must first determine the appropriate standard of review to conduct its analysis of the ERISA plan administrator's decision to deny benefits.  In general, a *de novo* standard of review will apply to the plan administrator's determination, unless the plan grants authority to the administrator to use his or her discretion to construe the terms of the plan and determine eligibility for plan benefits. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  In *Firestone*, the Supreme Court held that "a denial of benefits challenged under [ERISA] § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or construe the terms of the plan." *Id.*

Under a *de novo* standard of review "the Court will review 'all aspects of [the] administrator's eligibility determination, including fact issues, *de novo*.'"  *O'Hara v. National Union Fire Ins. Co. of Pittsburgh, PA*, 697 F. Supp. 2d 474, 476 (W.D.N.Y. 2010) (quotation omitted).  When a court engages in *de novo* review, plan terms are "given their plain meanings," *Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1084 (1st Cir. 1990), and ambiguities in plan language are to be construed in favor of the claimant, *see Masella v. Blue Cross & Blue Shield of Conn., Inc.*, 936 F.2d 98, 107 (2d Cir. 1991) (citations omitted); *Rudolph v. Joint Industry Bd. of Elec. Industry*, 137 F. Supp. 2d 291, 300 (S.D.N.Y. 2001).  Under a *de novo* standard of review, no deference is given to the plan administrator's interpretation of the plan.  *See Katzenberg v. First Fortis Life Ins. Co.*, 500 F. Supp. 2d 177, 193-94 (E.D.N.Y. 2007) (citation omitted).  Indeed, "the fiduciary must show that the claimant's interpretation is unreasonable and that its own interpretation is the only one that could fairly be placed on the policy." *Rudolph*, 137 F. Supp. 2d at 300 (citing *Alfin, Inc., v. Pacific Ins. Co.*, 735 F. Supp. 115, 119 (S.D.N.Y. 1990)).

If a benefits plan grants the plan administrator discretionary authority to determine

eligibility for benefits, however, an arbitrary and capricious standard of review will be applied to

the administrator's determination.  *See Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d

243, 249-52 (2d Cir. 1999).  Under the arbitrary and capricious standard, a denial of benefits "may

be overturned only if the decision is 'without reason, unsupported by substantial evidence or

erroneous as a matter of law.'"  *Id.* at 249 (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438,

442 (2d Cir. 1995)) (other citation omitted); *see also Fuller v. J.P. Morgan Chase & Co.*, 423

F.3d 104, 107 (2d Cir. 2005).  To establish that a plan administrator's decision is supported by

"substantial evidence," the decision must be supported by "'such evidence that a reasonable mind

might accept as adequate to support the conclusion reached by the [administrator.]'"  *Celardo v.

GNY Automobile Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (quotation

omitted).  There must be more than a "'scintilla'" of evidence to support the decision, but there

need not be a preponderance of the evidence, provided the evidence relied upon by the

administrator is reliable.  *See id.* (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d

Cir. 1995)).[6]

"'[A] plan under which an administrator both evaluates and pays benefits claims creates

the kind of conflict of interest that courts must take into account and weigh as a factor in

determining whether there was an abuse of discretion, but does not make *de novo* review

appropriate.'"  *Hobson v. Metropolitan Life Ins. Co.*, 574 F.3d 75, 82–83 (2d Cir. 2009) (citing

*McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008)).  Rather, a showing that

the administrator's conflict of interest affected the choice of a reasonable interpretation is one of

---

[6] The parties agree that the arbitrary and capricious standard of review applies in the present matter.

"several different considerations" that judges must take into account when "review[ing] the lawfulness of benefit denials." *Id.* at 83 (citations omitted).  "No weight is given to a conflict in the absence of any evidence that the conflict actually affected the administrator's decision." *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 140 (2d Cir. 2010).

In the present matter, Plaintiffs claim that because "Defendant AT&T is both Plan Sponsor and Plan Administrator," and because Defendant UHIC purportedly took "positions that were financially advantageous to Defendants," Defendant UHIC's alleged "change in position" regarding its denial of benefits to Plaintiff Sherie Giles for additional intravenous antibiotic treatments "gives rise to the presumption that the Plan Administrator acted with self-interest." *See* Dkt. No. 40-14 at 7.

Contrary to Plaintiffs' assertions, and as will be discussed in greater detail below, no conflict of interest is present in this case.  While Defendant AT&T is both the Plan Sponsor and the Plan Administrator, it delegated to Defendant UHIC both "the exclusive right to interpret and administer the provisions of the Plan," and the "responsibility and discretion for interpreting the provisions of the Plan, making findings of fact, determining the rights and status of participants and others under the Plan, and deciding disputes under the Plan." *See* AR at 274, 300.  Further, the Plan specifically states that "the Claim Administrator's decisions are conclusive and binding." *See id.* at 274.  Plaintiffs admit that Defendant UHIC is the "Claims Administrator" for the Plan. *See* Dkt. No. 23 at ¶ 26.

The record in this case makes clear that the decisions at issue in this matter were made exclusively by Defendant UHIC, in its role as Claims Administrator.  The record is devoid of any evidence that Defendant AT&T had any role in the decision to deny Plaintiffs claims.  Further, the Plan is self-funded by Defendant AT&T and Defendant UHIC does not insure the Plan, but

merely provides administrative and claim payment services.  As such, the Court finds that there is

no evidence of any conflict of interest in the present matter, or that Defendant UHIC's benefits

determinations were influenced in any way by any alleged self interest.


### 3. The parties' positions

#### a. Defendants' position

In support of their motion for summary judgment, Defendants argue that Defendant

UHIC's benefits determinations were not arbitrary and capricious and, therefore, must be upheld.

Defendants assert that Plaintiff Sherie Giles was provided benefits for IV antibiotic treatment

consistent with the Plan and that nothing in the administrative record supports Plaintiffs'

assertions that Plaintiff Sherie Giles was entitled to the additional benefits claimed.  *See* Dkt. No.

41 at 16.  Specifically, Defendants claim that Plaintiffs' allegations that Defendants improperly

relied on the IDSA Guidelines in formulating their Lyme disease policy is baseless.  *See id.* at 16-

17.  Defendants claim that its Lyme disease policy clearly and properly provides that IV antibiotic

treatments for Lyme disease extending beyond four weeks are not proven to be effective and,

therefore, Plaintiff Sherie Giles' claims were properly denied as "unproven and unwarranted."  *See*

*id.* at 16.


#### b. Plaintiffs' position

In opposition to Defendants' motion for summary judgment, Plaintiffs first assert that

Defendants have a conflict of interest, which the Court must consider in determining whether

Defendants' decision was arbitrary and capricious.  *See* Dkt. No. 47 at 5-6.  Plaintiffs assert that

the arbitrariness of Defendants' decision to terminate benefits is shown in several ways, but

mainly through the abrupt reversal of its position after providing the benefit for many months. *See id.* at 3-4.  Plaintiffs claim that Defendant UHIC issued twenty-eight EOBs[7] to Plaintiffs which provided an explanation for its decision for each of Plaintiffs' claims for reimbursement for the IV antibiotic treatments provided from March of 2007 through June 28, 2007.  *See id.* at 3.  In a notice dated July 23, 2007, Defendant UHIC continued to authorize IV antibiotic treatment for the period of July 20, 2007 through August 13, 2007.  *See id.* (citing AR 2235).

Thereafter, in a letter dated August 14, 2007, nearly five months after the first IV antibiotic treatment, Plaintiffs assert that Defendant UHIC announced that it was terminating coverage.  *See id.*  Defendant UHIC claims in the letter that, "at this time" the IV antibiotic treatment is not a covered benefit under the Plan and that it is an "unproven" service.  *See id.*  Plaintiffs claim, however, that despite this letter, Defendant UHIC continued to make reimbursement payments through November 5, 2007.  *See id.* at 4 (citing AR 2617).  Finally, in a letter dated February 8, 2008, Defendant UHIC announced that IV antibiotic treatments beyond four weeks were excluded from the Plan coverage and that Plaintiffs' claims beyond four weeks were processed in error, but that Defendants would not seek reimbursement for the improperly paid for benefits.  *See id.* (citing AR 2617).  It was not until February 20, 2008, that Defendant UHIC issued twenty-two EOBs in which it denied claims for reimbursement for treatments after November 5, 2007.  *See id.*

Based on the foregoing, Plaintiffs claim that the abrupt and unexplained denial of benefits gives rise to the presumption that Defendants acted in self-interest.  *See id.* at 4.  Further, Plaintiffs claim that Defendants provided inadequate notice of its reasons for the denial of benefits.  *See id.*  Relying on several studies, Plaintiffs assert that long-term IV antibiotic treatments for chronic Lyme disease are not unproven services.  *See id.* at 5-10.  Finally, Plaintiffs

---

[7] Explanation of Benefits.

assert that Defendants imposed a standard not required by the Plan's provisions and interpreted the Plan in a manner inconsistent with its plain words, rendering the decision arbitrary and capricious. *See id.* at 6 (citing *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008)).

### 4. Application

As discussed, on December 22, 2008, Plaintiffs appealed Defendant UHIC's denial of benefits for Plaintiff Sherie Giles' treatments obtained between January 1, 2008 and November 12, 2008. *See* AR 2703-67.  Thereafter, Plaintiffs appealed the denial of their first appeal.  Contrary to Plaintiffs' assertions, Defendants' denial of benefits and subsequent denial of their appeals was not arbitrary and capricious.

Plaintiffs' first level appeal was reviewed by Dr. Phillip Robzyk and he agreed with the denial of benefits because the services were "unproven."  *See id.* at 2769-71.  Dr. Robzyk relied on peer-reviewed medical literature which he found insufficient to demonstrate "that prolonged and repeated therapy with IV antibiotics is an effective treatment for recurrent or chronic Lyme's disease that has a beneficial effect on health outcomes."  *See id.* at 2770.  Similarly, Dr. Tehrani reviewed Plaintiffs' second level appeal and, relying on independent studies and cohort trials, found that the services do not have a beneficial effect on health outcomes.  *See id.* at 2918.

By letter dated June 13, 2009, Plaintiffs appealed Defendant UHIC's denial of benefits for the treatments Plaintiff Sherie Giles obtained between November 13, 2008 and April 16, 2009. *See id.* at 2937-72.  Again, Dr. Robzyk reviewed Plaintiffs' first level appeal and, on July 15, 2009, citing to Defendants' "Lyme Disease medical policy," denied the appeal finding that the treatments constituted "unproven services."  *See id.* at 2986-88.  Then, prior to issuing its decision regarding Plaintiffs' second level appeal, Defendant UHIC responded to a complaint letter that

Plaintiffs had sent to it.  *See id.* at 3603.  This letter stated that all material submitted in support of Plaintiffs' appeals was reviewed and that,

> [i]n total, six different physicians, including two external infectious disease specialists reviewed the information submitted.  The literature you submitted was not given much weight because it is not information from well-conducted randomized controlled trials or well-conducted cohort studies.  Moreover, all six reviewers found that the preponderance of such literature on the subject does not support more than four weeks of IV antibiotic therapy for any form of Lyme disease.  This is also supported by our medical policy on the Treatment of Chronic and Recurrent Lyme Disease.

*See id.*

Thereafter, on October 16, 2009, Defendant UHIC denied Plaintiffs' second level appeal. *See id.* at 3604-06.  In this denial, Defendant UHIC informed Plaintiffs that Dr. R. Guy Shrake reviewed the appeal and provided a non-exclusive list of the documents, studies and other evidence he reviewed in reaching his conclusion.  *See id.* at 2604-05.  Defendant UHIC concluded that none of the submitted evidence demonstrates that the services have a beneficial effect on health outcomes and further found that none of the submitted evidence constituted "[w]ell-conducted randomized controlled trials" or "[w]ell-conducted cohort studies[,]" as required.  *See id.*  Defendant UHIC's decisions were supported by substantial evidence, and were not arbitrary and capricious.

In *Risenhoover v. Bayer Corp. Group Health*, 83 F. Supp. 2d 408 (S.D.N.Y. 2000), the plaintiff was diagnosed with Lyme disease and was prescribed IV antibiotic treatment in March of 1997.  *See id.* at 409.  The plaintiff stopped this treatment in July of 1997 because of an adverse reaction.  *See id.*  Thereafter, the plaintiff began seeing Dr. Kenneth B. Liegner who also diagnosed her with Lyme disease and again began IV antibiotic treatment in September of 1998, which the defendant agreed to reimburse.  *See id.*  The treatment continued for six weeks, was

interrupted for about two weeks because of cancellation of insurance approval, and was then reinstated upon subsequent approval. *See id.* This treatment continued until June of 1999, when the plaintiff developed an infection which required her to be taken off the antibiotics. *See id.* Then, on September 14, 1999, Dr. Liegner wrote the plan administrator requesting pre-approval for reinstatement of the IV antibiotic treatment. *See id.* at 409-410. The plan administrator responded on October 27, 1999, requesting the plaintiff's complete medical records and, for the interim, agreed to reimburse the requested treatment during the pendency of their deliberations, "with the understanding that defendants would not thereby acknowledge medical necessity although either party could cite the consequences of treatment as proof or disproof of its efficacy." *Id.* at 410. Then, on December 15, 1999, the defendant also sent the plaintiff a letter advising that reimbursement would be terminated immediately and sent a copy of the evaluation cited in the letter. *See id.*

    Finding that the defendant's decision was not arbitrary and capricious, the court found that the plan administrator, on four separate occasions, had the plaintiff's claims examined by outside medical experts who all recommended against the continued use of IV antibiotics. *See id.* at 412. Further, the court noted that "[e]ven plaintiff's treating physician, Dr. Liegner, is guarded, not taking a flat-out position that plaintiff has Lyme disease, and that the IV treatment is mandatory. He has stated some tentativeness in his diagnosis, and acknowledges that the length of IV treatment is the subject of legitimate difference of opinion and is a question of medical judgment." *Id.* (footnoted omitted). As such, the court found that the defendant's decision was not unreasonable, let alone arbitrary and capricious. *See id.*; *see also Hinman v. John Alden Life Ins. Co.*, No. 08-CV-1070, 2010 WL 466155, *10 (D. Or. Feb. 8, 2010) (holding that "[b]ecause the evidentiary record does not support the finding that the treatment [the plaintiff] received has been

recommended by a review article in a major peer-reviewed professional journal, [the plaintiffs']

argument that [the defendant's] decision was arbitrary and capricious necessarily fails.  In

addition, the records contains substantial evidence, upon which [the defendant] was entitled to

rely in making its coverage decision, that intravenous antibiotic treatment over periods greater

than one month is not generally accepted for the treatment of Lyme disease or of post-Lyme

disease syndrome").

    As in *Risenhoover* and *Hinman*, the Court finds that Defendants' decision was not arbitrary

and capricious.  Defendants decisions during the review process were based on the

recommendations of six different physicians, including two external infectious disease specialists,

who relied on numerous studies and evidence, nearly all of which question or completely discount

the efficacy of longterm IV antibiotics for the treatment of chronic Lyme disease.  *See Jacobs v.*

*Guardian Life Ins. Co. of Am.*, 730 F. Supp. 2d 830, 859 (N.D. Ill. 2010) (citing *Ortlieb*, 387 F.3d

at 783-84 ("explaining that an insurer's denial of coverage was reasonable where four physicians,

including two 'external, independent physician consultants,' reviewed a beneficiary's medical file

and 'consistently determined TPN therapy was an unproven therapy for Ortlieb's medical

conditions"); *Santucci*, 955 F. Supp. at 929-30 ("concluding that it was not arbitrary and

capricious for the claims administrator to rely on the opinions of two consulting oncology

physicians in determining that the plaintiff's treatment fell under the experimental exclusion under

the Policy")) (other citation omitted).  The evidence in the administrative record supports the use

of IV antibiotics for, according to one-study, up to ten weeks.  *See* AR at 502.

    Moreover, the Court finds that Defendants' abrupt reversal of its position after providing

this benefit to Plaintiff Sherie Giles well-beyond the four weeks does not render their decision

arbitrary and capricious.  The fact that Defendants claimed that payments for treatment beyond

four weeks were processed in error does not change this conclusion.  Defendants' policy regarding the treatment of chronic Lyme disease expressly states that IV antibiotic treatment is recommended for up to four weeks, with the possibility for repeat treatment if relapse occurs after the termination of the IV treatment.  As the Court found in *Risenhoover*, where the plaintiff also received IV antibiotics well-beyond the recommended four weeks, Defendant UHIC's provision of benefits for this period and subsequent termination was not arbitrary.  Regardless of whether Defendant UHIC made payments for this benefit beyond the four weeks by mistake or because they credited Dr. Liegner's assessment that these treatments were necessary in light of the fact that other courses of treatment had failed, the Plan makes clear that Plaintiff Sherie Giles was not entitled to payment for this treatment in perpetuity.  Based on the foregoing, the Court finds Defendants' decision to terminate Plaintiff Sherie Giles' benefits was not arbitrary and capricious.

Further, the Court rejects Plaintiffs' arguments that the IDSA guidelines are invalid and not supported by clinical evidence and that Defendants' decision was arbitrary and capricious because they relied on their policy for the treatment of chronic Lyme disease.  As discussed, Defendants' Lyme disease policy cited to not only the IDSA guidelines, but also cited to several controlled trials and cohort studies, as well as to the recommendation of the American Academy of Neurology, a professional society.  The American Academy of Neurology expressly "discourages the prolonged use of antibiotics to treat nervous system Lyme disease, contending there is no compelling evidence that such treatment has any beneficial effect in treating symptoms that persist following standard therapy."  *See* AR at 503.

Moreover, Plaintiffs mistakenly rely on cases such as *Curry v. American Intern. Group, Inc. Plan No. 502*, 579 F. Supp. 2d 413 (S.D.N.Y. 2008), which held that the defendant's termination of benefits violated ERISA because the defendant failed to give the plaintiff notice in

writing setting forth the specific reasons for denying the benefits.  *See id.* at 422 (citation omitted).

In *Curry*, unlike here, the defendant never gave the plaintiff notice that it was terminating her

benefits because she refused to receive an alternative treatment.  *See id.*  This notice "informs

claimants of the specific reasons for the denial of benefits and facilitates administrative review."

*Id.* (citing *Juliano v. HMO of N.J., Inc.*, 221 F.3d 279, 287 (2d Cir. 2000)).  In the present matter,

unlike *Curry*, Plaintiffs were afforded this required notice, in writing, setting forth the reason for

the denial and Plaintiffs were able to participate fully in the administrative review process.  *See*

*Hobson v. Metropolitan Life Ins. Co.*, 574 F.3d 75, 87 (2d Cir. 2009) (setting forth the notice

requirements a plan administrator must provide in order to be in compliance with ERISA).

   Finally, the Court rejects any claim that Defendants accorded undue weight to the opinions

of the reviewing physicians.  As the Second Circuit has made clear, administrators are entitled to

rely on the opinions of medical consultants and are "not required to accord the opinions of a

claimant's treating physicians 'special weight,' especially in light of contrary independent

physician reports."  *Id.* at 90 (quoting *Black & Decker*, 538 U.S. at 834, 123 S. Ct. 1965).

   Based on the foregoing, the Court finds that Defendants' decision was not arbitrary and

capricious; and, therefore, the Court denies Plaintiffs' motion for summary judgment and grants

Defendants' motion for summary judgment as to this claim.[8]

---

[8] The Court notes that even if it considered the literature and studies Plaintiffs included as
exhibits in its motion for summary judgment, which were not a part of the Administrative Record,
the outcome reached is the same.  For example, Plaintiffs refer to "another well-controlled study
entitled, A Randomized Placebo-Controlled Trial of Repeated IV Antibiotics Therapy for Lyme
Encephalopthy," in support of their position that Defendants' decisions were arbitrary and
capricious.  *See* Dkt. No. 50 at 21.  In this study, patients were treated with 10 weeks of IV
ceftriaxone, which "resulted by week 24 sustained improvement in measures of physical
functioning and pain."  *See id.*  Plaintiffs contend, however, that the study found that the "initial
improvement noted in cognitive functioning was lost after the subsequent 14 weeks of no
antibiotics[;]" and, therefore, in providing his study to the IDSA review panel, the doctor who

(continued...)

**B.     Plaintiffs' breach of fiduciary duty claim**

Plaintiffs' fifth cause of action alleges that Defendants breached their fiduciary duties under ERISA by "wrongfully denying benefits under the Plan," obtaining medical opinions from "unqualified" consultants, and "justifying denials upon guidelines and reports which were tainted and void."  *See* Dkt. No. 23 at ¶¶ 50-52.  Defendants claim that they are entitled to summary judgment on this claim because (1) Plaintiffs are simply restating their claims for allegedly unpaid benefits and statutory damages as claims in equity pursuant to 29 U.S.C. § 1132(a)(3); (2) the record clearly shows that Plaintiffs were provided with all of the relevant plan documents prior to the final determination; (3) Defendant UHIC is not the "plan administrator" and therefore is not subject to the statutory disclosure obligations set forth in ERISA; and (4) Defendants' benefits determinations are supported by and consistent with its Lyme disease policy, the IDSA guidelines, and were reviewed by four different medical directors, all of whom concluded that Plaintiff Sherie Giles was not entitled to the claimed benefits.  *See* Dkt. No. 41 at 20-21.

First, the Court finds that Plaintiffs have abandoned their breach of fiduciary duty claim because they failed to respond to Defendants' arguments that this claim must be dismissed.  *See Rohn Padmore, Inc. v. LC Play Inc.*, 679 F. Supp. 2d 454, 459 (S.D.N.Y. 2010) (holding that "'[w]here one party fails to respond to an opposing party's argument that its claim must be

---

[8](...continued)
conducted the study concluded that, "based on the evidence cited above, one cannot conclude that repeated antibiotic therapy is ineffective in improving some of the symptoms associated with post-treatment Lyme Syndrome."  *See id.*

Contrary to Plaintiffs' position, this study does not support the sustained/uninterrupted use of IV antibiotics for the treatment of chronic Lyme disease.  At best, it supports the theory that an initial course of ten weeks of IV antibiotic treatment is beneficial, followed by one or more additional courses after the patient has ended his or her initial course of treatment with IV antibiotics.  The study recommended "repeated" treatments, not continuous treatment.

dismissed, courts may exercise their discretion and deem the claim abandoned'" (quotation omitted)); *see also Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) (holding that "[f]ederal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way").

Even if Plaintiffs did not abandon their breach of fiduciary duty claim, summary judgment is still appropriate.  ERISA provides a cause of action "by a plan participant, beneficiary or fiduciary to enjoin any act or practice that violates any provision of this subchapter or the terms of the plan, or . . . to obtain other appropriate equitable relief."  29 U.S.C. § 1132(a)(3).  "However, plaintiffs may not restate claims for unpaid benefits and statutory damages as claims in equity under § 1132(a)(3).  Equitable remedies under § 1132(a)(3) are available only where ERISA's civil enforcement provisions do not provide adequate relief."  *Krauss v. Oxford Health Plans, Inc.*, 418 F. Supp. 2d 416, 433 (S.D.N.Y. 2005) (citing *Varity Corp. v. Howe*, 516 U.S. 489, 513-514, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996)).  "The Second Circuit has stated that individuals retain a right to seek equitable relief under ERISA only where such relief is 'appropriate.'"  *Id.* (quoting *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 89-90 (2d Cir. 2001)).  "'Compensatory damages, even if they resulted from a breach of fiduciary duty, are not recoverable as equitable relief under § 1132(a)(3).'"  *Id.* (quoting *Del Greco v. CVS Corp.*, 337 F. Supp. 2d 475, 489 (S.D.N.Y. 2004)).

In the present matter, Plaintiffs' claims for relief are clearly restatements of their claims for unpaid benefits; and, therefore, the Court grants Defendants' motion for summary judgment as to Plaintiffs' fifth cause of action on this alternative ground.  *See id.*

**C.**     **Plaintiff Sherie Giles' claim that Defendant UHIC's decision regarding the Medicare Opt-Out was improper**

Plaintiffs claim that prior to declaring that the antibiotic IV treatment was "unproven," Defendant UHIC had processed the claims by deducting an "estimated" amount of what it believed that Medicare would pay for each service, despite the fact that both Plaintiffs and Dr. Liegner advised Defendant UHIC that Dr. Liegner had opted out of the Medicare program.  *See* Dkt. No. 40-14 at 20 (citing AR 776).  Plaintiffs claim that Defendant UHIC's position is contrary to the position taken by Defendant AT&T.  *See id.*  Specifically, in an email dated February 23, 2007, Plaintiffs claim that Defendant AT&T's "Consultant-Benefit Plan Administration, Executive Response Team," advised Plaintiffs that

> "[p]ayment on claims will be pay (sic) only the 'reasonable and customary' allowable amount.  For doctors opting out of Medicare and no claim will be filed with Medicare, UHC will require a letter or notation submitted with each claim advising the provider has opted-out of Medicare.  Basically, if the member identify (sic) that the providers have opted-out of Medicare on the claim, the claims should be paid accordingly.  Reimbursement will be sent to the member."

*See id.* at 20-21 (quoting AR 2228).  Thereafter, Defendant UHIC, after Plaintiffs had complied with Defendant AT&T's instructions, only reimbursed Plaintiffs twenty percent of the total cost of the treatment Plaintiff Sherie Giles received.  *See id.* at 21.  In a letter dated January 9, 2008, Defendant UHIC acknowledged that Dr. Liegner had opted out of Medicare and, therefore, cannot file Medicare claims, but nevertheless concluded as follows:

> "It is true that Medicare does not pay for IV antibiotics but if you would have received services from a Medicare provider and received a denial stating the service was not covered based on Medicare necessity, we could consider the claim from the provider (billed amount) under your UnitedHealthcare medical plan.  However, you chose to receive services from a provider that has opted out of the Medicare program, who cannot file claims to

> Medicare.  Because you made the decision we will estimate what
> Medicare would have covered, 80% (typically) and reimburse on the
> remaining 20%."

*See id.* (quoting AR 2594).  Further, Plaintiffs claim that Defendant UHIC provided them with a

summary plan description ("SPD") in October of 2006 which made no reference to an "estimated"

Medicare payment and which was "an SPD for employees of SBC, not AT&T."  *See id.* (citing

AR 2536, 2620).  As such, Plaintiffs claim that Defendant UHIC's decision was based on an SPD

that did not apply to them.  Finally, Plaintiffs claim that the Medicare opt out was not applicable

because Medicare does not provide coverage for IV antibiotic treatment unless a physician is

present.  *See id.* at 22 (citing AR 2537).

      In the SPD, the section entitled "Effect on the Benefits of this Plan" explains the effects of

primary coverage plans and Medicare on the benefits received by beneficiaries of the Plan.  *See*

AR at 278-79.  Relevant here, the SPD provides that "[t]his Coverage Plan reduces its Benefits as

described below for Covered Persons who are eligible for Medicare Part A or B **when Medicare**

**would be the Primary Coverage Plan**."  *See id.* at 278 (emphasis added).  **The Plan provides that**

> [m]edical benefits are determined as if the full amount that would
> have been payable under Medicare was actually paid under
> Medicare, even if:
>
> > - The person is entitled to but not enrolled for Medicare.
> > Medicare benefits are determined as if the person were
> > covered under Medicare Parts A and B.
> >
> > \* \* \* \* \* \* \* \* \*
> >
> > -The person receives services from a provider who has
> > elected to opt-out of Medicare.  Medicare benefits are
> > determined as if the services were covered under Medicare
> > Parts A and B and the provider had agreed to limit charges
> > to the amount of charges allowed under Medicare rules.

*See id.*

In the present matter, Defendants are correct that the Plan allows them to reduce the benefit paid if the treatment was provided by a medical provider who has opted out of Medicare by what Medicare would have covered if the provider had not opted out.  *See* AR at 278.  The Plan does not, however, provide that Defendants may reduce the medical benefits if the patient receives services that Medicare does not reimburse, but are services otherwise allowed under the Plan.  *See id.*  The section of the Plan discussing the effects of Medicare and other primary coverage plans provides for several ways in which the amount paid for services may be reduced; none of the provisions, however, contemplate a situation in which Plaintiffs' Plan provides for payment for the service, but Medicare does not.

In effect, under the guise of interpretation, Defendant UHIC has taken it upon itself to rewrite the Plan by adding terms where none previously existed.  Defendant UHIC claims that the language it relied on allows it to exclude an arbitrary eighty percent of the costs of services that are not covered by Medicare, despite the fact that the cited language in the Plan only contemplates reducing payment when the beneficiary selects to receive services otherwise covered by Medicare from a provider who has opted out of Medicare or when the beneficiary could be, but has not enrolled in Medicare.  The Plan does not state that benefits will be reduced "even if the services would not otherwise be covered by Medicare because it is a service that Medicare does not cover." *See Danouvong ex rel. Estate of Danouvong v. Life Ins. Co. of North America*, 659 F. Supp. 2d 318, 328 (D. Conn. 2009) (holding that "'[d]iscretion to interpret a plan, however, does not include the authority to add eligibility requirements to the plan. . . . [U]nder even the most deferential review, adding eligibility requirements to a plan is arbitrary and capricious'" (quoting *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004)) (other citation omitted).

Further, Defendant UHIC's interpretation of the Plan is contrary to its actual language. Specifically, the plan provides that benefits will be reduced "**when Medicare would be the Primary Coverage Plan**[;]" it does not provide that benefits will be reduced "regardless of whether Medicare would be the Primary Coverage Plan[.]" *See* AR at 278 (emphasis added). Defendant UHIC conceded that, even if Dr. Liegner still participated in Medicare, the IV antibiotic treatments would not be covered by Medicare. *See id.* at 2594. Therefore, Medicare would not have been the "Primary Coverage Plan" and Defendant UHIC acted arbitrarily and capriciously in reducing Plaintiff Sherie Giles' benefits in accordance with this provision. Further, even if it was not arbitrary and capricious for Defendant UHIC to interpret Medicare as being the "Primary Coverage Plan," the only possible non-arbitrary "estimated" Medicare reduction is **zero**, since the service was not covered by Medicare.

Finally, the fact that the Lyme disease policy only recommends paying for these services for up to four weeks does not change this result. Defendant UHIC provided Plaintiff Sherie Giles with payments for this benefit from March 27, 2007 through November 8, 2007. Although the Lyme disease policy recommends not providing this benefit in perpetuity, while this benefit was being provided to Plaintiff Sherie Giles, Defendant UHIC was not entitled to interpret the provisions of the Plan in an arbitrary and capricious manner in order to minimize their payment obligations.

Based on the foregoing, the Court finds that Defendant UHIC's interpretation of the Plan and decision to reimburse Plaintiff Sherie Giles for only twenty percent of the in-home treatments she received was arbitrary and capricious. As such, the Court grants this part of Plaintiffs' motion for summary judgment.

**D.    Plaintiff Lewis Giles' claim that Defendant UHIC arbitrarily denied his appeal regarding reduced reimbursement rates**

Plaintiff Lewis Giles claims that, while he was under Dr. Liegner's care, Defendant UHIC used a reimbursement rate which was set using the Ingenix Database, that was based on competitive rates where Plaintiff Lewis Giles resided, not where Dr. Liegner's office was located and services rendered, which was improper.  *See* Dkt. No. 40-14 at 22.  As such, Plaintiff Lewis Giles claims that Defendant UHIC arbitrarily denied his appeals and that he is entitled to $265.20 in reimbursement incurred as a result of two office visits and certain laboratory services.  *See id.* at 23.  Defendants, however, claim that a settlement agreement in a class action lawsuit between Defendant UHIC and the plaintiffs precludes Plaintiff Lewis Giles' claims because he did not opt out of the settlement class, as he was required to do.  *See* Dkt. No. 41 at 17-18.

Contrary to Plaintiffs' assertions, Plaintiff Lewis Giles is precluded from bringing these claims and the Court may take judicial notice of the class action lawsuit and the documents filed therein.  *See Hansen v. Harper Excavating, Inc.*, 641 F.3d 1216, 1219 n.2 (10th Cir. 2011) (taking judicial notice of documents filed in an earlier ERISA case which were available through the court's electronic filing system because they were facts "'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned'" (quoting Fed. R. Evid. 201(b)(2)); *see also Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 631 (2d Cir. 2008) (holding that "a district court's decision to admit evidence outside the administrative record is discretionary, 'but which discretion ought not to be exercised in the absence of good cause'" (quotation omitted)).[9]  In the class-action lawsuit, "any person who did not want to be bound by

---

[9] The Court's decision to take judicial notice of the class action suit is further supported by the fact that Plaintiffs referenced the class action in their amended complaint and attached an announcement by the New York State Attorney General discussing the settlement in that case.

(continued...)

the terms of that settlement was required to 'opt-out' of it by July 27, 2010."  *See* Dkt. No. 39-16.

Thereafter, the settlement was approved on October 5, 2010.  *See* Dkt. No. 41 at 18 (citation

omitted).  Further, upon review of the docket in the class action matter, it is clear that the

settlement class was certified on November 17, 2009.  *See American Medical Association v.*

*Metropolitan Life*, No. 1:00-cv-2800, Dkt. No. 433 (S.D.N.Y.).

Despite the fact that Plaintiffs filed their complaint and commenced this suit on March 12,

2009, *see* Dkt. No. 1, Plaintiff Lewis Giles was still required to opt-out of the settlement class

within the date specified in the class action settlement.  In *Manhattan-Ward, Inc. v. Grinnell*

*Corp.*, 490 F.2d 1183 (2d Cir. 1974), the Second Circuit held that the individual plaintiffs' claims

were precluded because they failed to opt-out of the class settlement even though the individual

actions were filed before the class was certified.  *See id.* at 1185-86.  Plaintiffs do not claim that

they never received the notice required under Rule 23 of the Federal Rules of Civil Procedure, and

do not claim that they opted-out of the settlement class in the manner required.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to

Plaintiff Lewis Giles claim and denies Plaintiff Lewis Giles' motion for summary judgment as

moot.

**E.**      **Plaintiffs' claim for attorney's fees**

In their sixth cause of action, Plaintiffs request an award of attorney's fees.  *See* Dkt. No.

23.  Although 29 U.S.C. § 1132(g) does grant the Court discretion to award attorney's fees, it is

well-settled that "a request for fees does not in itself state a cause of action."  *Cerasoli v. Xomed,*

---

[9](...continued)
*See* Dkt. No. 23 at ¶ 38 and Exhibit "E."

*Inc.*, 972 F. Supp. 175, 183 (W.D.N.Y. 1997).  As such, the Court dismisses count six, without prejudice to Plaintiffs making an application for attorney's fees.  *See id.* (citing *Gerzog v. London Fog Corp.*, 907 F. Supp. 590, 603 (E.D.N.Y. 1995)).


## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

ORDERS that Defendants' motion for summary judgment is **GRANTED in part and DENIED in part**; and the Court further

ORDERS that Plaintiffs' motion for summary judgment is **GRANTED in part and DENIED in part**; and the Court further

ORDERS that Defendants' motion to strike is **DENIED**; and the Court further

ORDERS that the parties' counsel shall be available for a telephone conference on **Thursday, February 9, 2012, at 9:30 a.m.** to discuss the issue of damages and attorney's fees. Defendants' counsel shall initiate the call using a professional conferencing service; and the Court further

ORDERS that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: February 7, 2012
     Albany, New York

Mae A. D'Agostino
U.S. District Judge

33